# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA          :

                                  :                    ss: New Haven, Connecticut

COUNTY OF NEW HAVEN               :

FILED

2018 JUN -8 A 10:2

U.S. DISTRICT COURT
NEW HAVEN, CT.

3:18mj878(SALM)

## AFFIDAVIT

I, Dana R. Mofenson, being duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I am employed as a Special Agent with the Drug Enforcement Administration (hereinafter, "DEA") and have been so employed since August 2004.

2.      I am currently assigned to the DEA New Haven District Office (hereafter, "NHDO") Task Force and am currently assigned to investigate drug traffickers and organizations responsible for manufacturing illicit and/or diverting licit opioids and other drugs within the State of Connecticut. During my previous assignment to the DEA NHDO Tactical Diversion Squad, and previous assignment to the DEA Bridgeport Resident Office High Intensity Drug Task Force, I have prepared numerous affidavits in support of applications for federal search warrants and arrest warrants, as well as in support of authorizations to conduct electronic surveillance. As a case agent, I have directed and coordinated electronic surveillance, controlled purchases of drugs, physical surveillance, and undercover activities, as well as debriefed and managed confidential sources. I am familiar with the manner in which individuals obtain, finance, store, manufacture, transport, and distribute their illegal drugs. I have a Bachelor of Arts and a Bachelor of Business Administration from the University of

1

Massachusetts at Amherst and a Master of Science from Northeastern University. I have completed the 16 week DEA Basic Agent Trainee academy in Quantico, Virginia. I have also attended numerous law enforcement training courses related to the field of drug law enforcement and hold a Police Instructor Certification on the topic of drug law enforcement with the State of Connecticut Police Officer Standards and Training Council.

      3.    I am an investigative or law enforcement officer of the United States within the meaning of l8 U.S.C. § 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. Currently, I am involved in an investigation involving an identified distributor of oxycodone pills in Shelton, Connecticut. I make this affidavit in support of a search warrant directed at Verizon Wireless for telephone text messages and other content, described in Attachment A, associated with the cellular telephone with assigned telephone number 203-231-0439 for March 10, 2018 through April 30, 2018.[1] This telephone is subscribed to in the name of "Tracy A Perry" and used by Salvatore PERRY, as set forth below. The above referenced communications are believed to be evidence in furtherance of possession with intent to distribute oxycodone, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to distribute oxycodone, in violation of 21 U.S.C. § 846. This cellular telephone will also be referred to herein as the "Target Telephone."

---

1 On March 20, 2018, April 10, 2018 and April 30, 2018, members of the DEA NHDO sent preservation requests to Verizon Wireless requesting that certain information associated with telephone number 203-231-0439, including text messages for the prior 10 days, be preserved. Verizon Wireless confirmed that the requests had been received and processed. Thus, I believe that the time period identified in the requested warrant—March 10, 2018 through April 30, 2018, is available.

4.     This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter. The statements contained in this affidavit are based, in part, on the information provided by Special Agents and Task Force Officers of the DEA, as well as officers from other law enforcement agencies; on law enforcement officers' review of seized electronic evidence (including stored text messages) and on experience and training of the affiant.

## BACKGROUND OF THE INVESTIGATION

5.     This investigation involves the distribution of oxycodone pills, a Schedule II controlled substance. These pills are heavily abused and trafficked throughout the United States and have been prone to counterfeit. In particular, I am investigating violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute, and distribution of, oxycodone) and 21 U.S.C. § 846 (conspiracy to distribute oxycodone). This investigation by the DEA NHDO involves information provided by a credible and reliable DEA Confidential Source, the controlled purchase of oxycodone pills by the DEA Confidential Source from Salvatore PERRY, surveillance efforts by law enforcement and information gleaned by investigators from commercial and government database checks.

## PROBABLE CAUSE

6.     In March 2017, members of the DEA NHDO TDS interviewed a DEA Confidential Source, hereinafter referred to as "CS." The CS provided information regarding an individual known to the CS as "Sal PERRY." Salvatore PERRY is known as being involved in the construction business and is known to law enforcement. During continued debriefings with the CS, law enforcement was provided with information relative to the drug trafficking activities of PERRY.

7.      The CS reported that PERRY is currently distributing oxycodone and cocaine. The CS reported that PERRY has distributed illegal drugs for years. The CS reported that PERRY is involved with construction. The CS reported that PERRY funded his business with illegal drug proceeds. The CS reported that PERRY has multiple sources of supply for both cocaine and oxycodone. The CS reported that he/she was in a position to purchase oxycodone from PERRY.[2]

8.      On September 20, 2017, investigators met with the CS. The CS stated that, at the direction of the DEA, the CS had communicated with PERRY via text message to and from the Target Telephone earlier in the day. The CS stated that he/she and PERRY communicated regarding the CS purchasing 30 milligram oxycodone pills for $20 per pill from PERRY. These text messages are transcribed as follows:

**CS:**      What's up Sal...it's [first name of CS] How much for each of those things we
            were talking about.?

**PERRY:**   20

**CS:**      Cool. Can you do 50 of them??

**PERRY:**   Call me...

**CS:**      I will in a little bit bro...I have practice with my kid right now..call you after

**CS:**      Thx

**PERRY:**   Allset...roger

---

2 Investigators have determined from a government database query that PERRY received at least two prescriptions for OxyContin (the brand name for oxycodone) 30 milligrams tablets on August 22, 2017 and September 19, 2017. Based upon the quantities discussed herein as well as PERRY's statements to the CS and text messages recovered as part of two previous search warrants, I also believe that PERRY has additional sources of prescription pills including other individuals.

9.      At approximately 9:14PM, at the direction and control of DEA, the CS contacted telephone number 203-231-0439.   SA Mofenson recorded the telephone conversation and subsequently transferred the conversation to a digital media disc.   The telephone call went to voicemail and no message was left.   The automated voicemail message was as follows, "Hi, you've reached Salvatore Perry, please leave a brief message."

10.      After placing the telephone call, the CS stated that he/she had received a telephone text message from PERRY at the Target Telephone.   These text messages are transcribed as follows:

**PERRY:**      Sorry...call u in a half

**CS:**            No prob

11.      At approximately 9:38PM, the CS received an incoming telephone call from the Target Telephone.  I recorded the telephone conversation and subsequently transferred the conversation to a digital media disc.   Investigators listened to the telephone call which took place on speaker phone. During the telephone conversation, the CS and PERRY discussed the details of a drug transaction in which the CS would purchase drugs from PERRY.  The CS asked if PERRY would be able to supply 50 pills.  PERRY responded that he would be able to supply "35 or 50" pills to the CS or an amount "very close" to the requested amount of 50 pills.   PERRY stated that he would contact the CS the following day.

**CONTROLLED PURCHASE SEPTEMBER 26, 2017**

12.      On September 26, 2017, members of the DEA NHDO TDS utilized the CS to complete the controlled purchase of oxycodone from PERRY.   On this date, the CS purchased 50 oxycodone pills for $1,000.

13.     At approximately 3:36PM, at the direction and control of DEA, the CS contacted PERRY at the Target Telephone. I recorded the conversation. During the telephone conversation, the CS and PERRY discussed the details of a drug transaction in which the CS would purchase oxycodone pills from PERRY. The CS and PERRY arranged to meet one another at 4:15PM. PERRY stated that he was at a construction site on Perry Hill Road and that he would be at the construction site or at his residence, which PERRY stated was in close proximity to the construction site. PERRY provided directions to his location at 82 Perry Hill Road and provided a description of his vehicle. The CS and PERRY agreed to communicate via text message.

14.     Prior (and subsequent) to the controlled purchase, the CS was searched for contraband and unaccounted for monies with negative results. The CS was provided with $1,250 in Official Advanced Funds and outfitted with an audio recorder. The CS was directed to travel to meet with PERRY. Surveillance was maintained on the CS.

15.     At approximately 4:19PM, surveillance observed the CS turn left into the construction area located off of Perry Hill Road, directly after the residence located at 82 Perry Hill Road. The CS contacted me via telephone and advised that PERRY had communicated with the CS and directed the CS to travel to PERRY's converted barn/ residence. Surveillance then observed the CS drive to the area of the barn.

16.     At approximately 4:30PM, surveillance observed the CS exit the area of the converted barn/ residence. Case officers then maintained surveillance on the CS and met with and debriefed the CS. The CS reported that he/she had met with PERRY, and PERRY was waiting on his oxycodone source of supply to make a delivery of pills. The CS also reported that PERRY stated he (PERRY)

had to complete an errand in Ansonia.  While the DEA was meeting with the CS, the CS and PERRY

exchanged a series of text messages.  These text messages are transcribed as follows:

**PERRY:** [name of CS]...looking more like 6 by the x I get back. ..just a heads up..ty (

**CS:** Np bro

**CS:** Hey brotha..we still good for 6??

**PERRY:** Allset...but 6:15 is good

**CS:** Good..I gotta be quick tho cause I got to get wrestling practice with my jr

**CS:** He crazy about being on time..lol

**PERRY:** No prob

**PERRY:** I'm good come on over

17.     Following the exchange of text messages, the CS was directed to travel to meet with

PERRY.  The CS then traveled to meet with PERRY while surveillance was maintained on the CS.

18.     At approximately 6:08PM, surveillance observed the CS enter the driveway to the

PERRY's residence.  After approximately ten minutes, surveillance observed the CS exit the area of

the residence.  I communicated with the CS and the CS stated that the transaction between the CS and

PERRY had taken place.

19.     Case officers then maintained surveillance on the CS and met with and debriefed the

CS.  Investigators took custody of the purchased drugs, recording devices and unused Official

Advanced Funds.  The CS stated that he/she walked into the kitchen area of the residence.  The CS

stated that PERRY was in the bedroom/office area of the residence.  The CS stated that PERRY

retrieved a black colored zippered bag.  The CS stated that PERRY opened the bag and retrieved a

prescription pill bottle.  The CS stated that PERRY "dumped" the contents of the prescription bottle,

which contained pills onto the desk.  The CS stated that PERRY counted the pills three or four times in the presence of the CS.  The CS stated that he/she counted the pills along with PERRY.  The CS stated that he/she then counted out the money for PERRY.  The CS stated that PERRY kept stating that he (PERRY) was not making any money from the transaction.  The CS stated that PERRY stated that he (PERRY) was doing this (selling drugs) for 20 years and had never had a problem.  The CS stated that PERRY stated that he (PERRY) only sells drugs to two or three other individuals.  The CS stated that PERRY stated that he (PERRY) gets 120 pills per month from this particular source of supply.

## CONTROLLED PURCHASE NOVEMBER 17, 2017

20.     On November 17, 2017, members of the DEA NHDO TDS utilized the CS to complete the controlled purchase of oxycodone from PERRY.  On this date, the CS purchased sixty (60) oxycodone pills for $1,380.

21.     At approximately 11:47AM, at the direction and control of DEA, the CS contacted PERRY at telephone number 203-231-0439.  During the telephone conversation, the CS and PERRY discussed the details of a pending drug transaction in which the CS would purchase oxycodone pills from PERRY.  The CS and PERRY had arranged to meet one another at the residence of PERRY in Shelton, CT.

22.     Prior (and subsequent) to the controlled purchase, the CS was searched for contraband and unaccounted for monies with negative results.  The CS was provided with $2,200 in Official Advanced Funds and outfitted with an audio recorder  The CS was directed to travel to meet with PERRY.  The CS then traveled to meet with PERRY.  Surveillance was maintained on the CS.

23.    At approximately 12:09PM, surveillance observed the CS turn into the driveway located at 82 Perry Hill Road, Shelton, CT.    Intermittent surveillance of the CS' vehicle was completed as the CS was at the residence.

24.    At approximately 12:22PM, surveillance observed the CS traveling on Perry Hill Road, in the direction away from the residence of PERRY.  Officers then maintained surveillance on the CS and met with and debriefed the CS.  Investigators took custody of the purchased drugs, recording device and unused Official Advanced Funds.  The CS stated that after arriving at the residence, the CS stated that he/she entered the kitchen area of the residence.  The CS stated that he/she saw a handgun on top of the refrigerator.  The CS stated that PERRY invited the CS into the kitchen.  The CS stated that he/she sat at the kitchen table.  The CS stated that PERRY walked across the apartment.  The CS stated that PERRY walked up three stairs and entered a room.  The CS stated that PERRY returned to the kitchen area after approximately thirty seconds or one minute.  The CS stated that PERRY returned with a black colored satchel and that PERRY sat down next to the CS. The CS stated that PERRY opened the satchel and removed a white colored envelope.  The CS stated that the envelope had writing on it.  The CS stated that PERRY removed a plastic bag that contained blue colored pills.  The CS stated that PERRY had had already sold some of the pills.  The CS stated that PERRY counted out 80 pills, after dumping them on the table, and placed them in piles of 20 each.  The CS stated that PERRY could only sell 60 pills to the CS and that 20 pills were for someone else.  The CS stated that PERRY stated he (PERRY) was getting an additional 75 pills in the coming week.  The CS stated that PERRY stated that he (PERRY) had been selling drugs for decades and had been dealing with the same group of people.  The CS sated that the CS and PERRY then discussed prices.  The CS stated that PERRY stated that his (PERRY'S) cost was $20 per pill and the CS and

PERRY agreed that the CS would pay $23 per pill.  The CS stated that he/she counted out $1,400 and that PERRY went and retrieved cash to make change.  The CS stated that PERRY handed the CS a $20 dollar bill from the approximate one-half inch thick fold pf currency that included: one, five, 20 and 100 dollar denominations.

## CONTROLLED PURCHASE JANUARY 6, 2018

25.     On January 6, 2018, members of the DEA NHDO, utilized the CS to complete the controlled purchase of oxycodone from PERRY.  On this date, the CS purchased sixty (60) oxycodone pills for $1,380.

26.     At approximately 10:04AM, at the direction and control of DEA, the CS contacted PERRY at telephone number 203-231-0439.  During the telephone exchange, the CS and PERRY discussed the details of a pending drug transaction in which the CS would purchase oxycodone pills from PERRY.  The CS and PERRY had arranged to meet at PERRY's house.

27.     Prior (and subsequent) to the controlled purchase, the CS (and vehicle of the CS) was searched for contraband and unaccounted for monies with negative results.  The CS was provided with $4,000 in Official Advanced Funds and outfitted with an audio recorder.  The CS was directed to travel to meet with PERRY at PERRY's residence.  The CS then traveled to meet with PERRY while surveillance was maintained on the CS.

28.     At approximately 10:48AM, surveillance observed the CS turn into the driveway located at 82 Perry Hill Road, Shelton, CT.  Intermittent surveillance of the CS' vehicle was completed as the CS was at the residence.

10

29.    At approximately 11:06AM, surveillance observed the CS reversing directions in the driveway of PERRY's residence.  Case officers then maintained surveillance on the CS and met with and debriefed the CS.

30.    The CS stated that he/she pulled into the driveway of Perry's house and observed three vehicles.  The CS stated that he/she went upstairs to the residence and met with PERRY.  The CS stated that he/she and PERRY went into PERRY's office which was located next to the kitchen.  The CS stated that he/she observed a firearm on top of the kitchen refrigerator.  The CS stated that he closed the door to the office.  The CS stated that PERRY went to his desk and retrieved a black colored canvas bag from the cabinet above the desk.  The CS stated that the canvas had was the same bag as the previous two controlled purchases.  The CS stated that PERRY pulled out one or several prescription pill bottles and asked the CS if the CS wanted 30 milligram pills to which the CS affirmed.  The CS stated that he/she was able to read the name on the label of the prescription pill bottle which was "Steven Barnes."  The CS stated that the name Steven was spelled with an "ev", as opposed to "ep."  The CS stated that pharmacy listed on the bottle was in Oxford.  The CS stated that PERRY counted out the pills and the money which was $1,380.  The CS stated that PERRY brought up the subject of cocaine and explained the process of how PERRY purchases cocaine.  The CS stated that PERRY stated that he (PERRY) usually buys one and half ounces of cocaine.  The CS stated that PERRY stated that he (PERRY) usually sells to two to three people and that the source of supply of the cocaine was a "really good connect" that PERRY has had for 20 years.  The CS stated that PERRY would be getting back to the CS later with information about the cocaine.  The CS stated that PERRY referred to his source of supply as "Juice" and that the source always gets back to PERRY about prices for the cocaine.  The CS stated that he/she had observed multiple labels in the bag and

that he/she also observed labels on the bottles. The CS stated that PERRY left the money on top of the desk and that PERRY and the CS walked out of the office. The CS stated that while speaking with PERRY as to the reason for selling drugs and that PERRY was "rebuilding" after his divorce.

## CONTROLLED PURCHASE APRIL 3, 2018

31.     On April 3, 2018, members of the DEA NHDO, utilized the CS to complete the controlled purchase of oxycodone from PERRY. On this date, the CS purchased 31 oxycodone pills for $680.

32.     At approximately 8:07PM, at the direction and control of DEA, the CS contacted PERRY at telephone number 203-231-0439. During the telephone conversation, PERRY stated that he (PERRY) would contact the CS in approximately 10 minutes. The CS then exchanged a series of telephone text message and telephone conversations with PERRY regarding the CS meeting with PERRY to complete the purchase of oxycodone from PERRY.

33.     Prior (and subsequent) to the controlled purchase, the CS (and vehicle of the CS) was searched for contraband and unaccounted for monies with negative results. The CS was provided with $2,500 in Official Advanced Funds and outfitted with an audio and visual recorders. The CS was directed to travel to meet with PERRY at PERRY's residence. The CS then traveled to meet with PERRY while surveillance was maintained on the CS.

34.     At approximately 8:58PM, surveillance observed the CS turn into the driveway located at 82 Perry Hill Road, Shelton, CT. Intermittent surveillance of the CS' vehicle was completed as the CS was at the residence.

35.     Shortly thereafter, officers observed the CS depart the driveway of PERRY's residence. Officers then maintained surveillance on the CS and met with and debriefed the CS.

36.     The CS stated that he/she traveled to the residence of PERRY and met with PERRY inside the residence.  The CS stated that he/she observed ammunition on top of the refrigerator in the residence, but did not see the firearm previously observed.  The CS stated that he/she and PERRY entered an office at the residence where the CS and PERRY completed the drug transaction.

37.     The CS stated that while in the office, PERRY counted out 31 oxycodone pills.  The CS stated that PERRY stated that the pills were all PERRY had left and that the pills would hold over the CS for a few days.  The CS stated that PERRY would be getting additional pills the next day.  The CS stated that PERRY charged $22 per pill and that PERRY had stored the pills in a drawer.  The CS stated that PERRY placed a rubber band around the cash and placed the currency in a drawer.  The CS stated that the CS and PERRY discussed cocaine.  The CS stated that PERRY had reestablished his connection with a cocaine source of supply within the past two weeks.

## SEARCH WARRANTS DIRECTED AT VERIZON

38.     On October 5, 2017, the United States District Court, the Honorable Sarah A.L Merriam, United States District Judge, authorized a warrant directed at Verizon Wireless for text messages for the Target Telephone for the time period of September 11, 2017 through October 5, 2017.

39.     On December 11, 2017, the United States District Court, the Honorable Sarah A.L Merriam, United States District Judge, authorized a warrant directed at Verizon Wireless for text messages for the Target Telephone for the time period of November 10, 2017 through December 11, 2017.[3]

---

3 After the DEA received Verizon Wireless's response related to the December 11, 2017 search warrant agents realized that Verizon Wireless had improperly included text messages dated after the

40.     A review of the text messages from the Target Telephone appear to relate to ongoing illegal drug distribution by PERRY and others.  For example:

    a.  On September 18, 2017, sent from Steven Barnes at telephone number 203-545-3957 to the Target Telephone. The text message is as follows: "I really need to see you i am broke right now."

    b.  On September 19, 2017, sent from the Target Telephone to Steven Barnes, at telephone number 203-545-3957. The telephone text message is as follows: "Steve...I'm on a water main break job in my dump truck...unexpected...cig lighter doesn't work so my phone is in one of the other."

    c.  On September 19,2017, sent from Steven Barnes at telephone number 203-545-3957, to the Target Telephone. The text message is as follows: "Is it still a go".

    d.  On September 19, 2017, sent from Steven Barnes at telephone number 203-545-3957, to the Target Telephone. The text message is as follows: "Can i come by".

    e.  On September 20, 2017, sent from Steven Barnes to the Target Telephone. The text messages is as follows: "For this one I have fifty next month I have 130."

---

December 11, 2017 cut-off date in its response.  The DEA notified Verizon Wireless of this fact and notified the United States Attorney's Office of the same.  The case agent deleted all text messages dated after December 11, 2017 from the working copy of the investigative file and further noted on the evidence bag that the original disc from Verizon Wireless should not be opened by anyone.  None of the messages dated after December 11, 2017 are included herein for probable cause purposes nor will any such messages be provided to the United States Attorney's Office absent Order of this Court.

41.     Investigators conducted a government database check requesting the prescription history of Steven Barnes. Investigators identified a series of prescriptions written to Steven Barnes, including prescriptions written for OxyContin 40 milligram tablets and oxycodone 30 milligram tablets. One of the prescriptions (for oxycodone 30 milligram tablets) was written for a quantity of 150 tablets. This prescription was written on September 18, 2017 and filled on this same date.

42.     Based upon my training an experience and upon my knowledge of this investigation, I believe that in the above referenced telephone text message, Salvatore PERRY and Steven Barnes are communicating with one another about the sale of a pending drugs transaction, specifically the sale of oxycodone pills from Steven Barnes to Salvatore PERRY. Through a commercial database check, investigators identified telephone number 203-545-3957 to be associated with Steven Barnes with a date of birth in 1950 and an address in Ansonia, Connecticut. As previously referenced within this affidavit, investigators note that during the meeting between the CS and PERRY on September 26, 2017, PERRY stated to the CS that he (PERRY) had to do an "errand" in Ansonia before he could sell oxycodone pills to the CS.

43.     Investigators also identified a telephone text message occurring on November 15, 2017, sent from Salvatore PERRY at the Target Telephone to an unidentified person (hereinafter "UP 4980") at telephone number 561-628-4980. The text message is as follows: "Hey...busy at the moment...but I can take all those parts from now on if u want.. talk later". Based upon my training and experience and upon my knowledge of this investigation, I believe that in the above referenced telephone text message Salvatore PERRY and UP 4980 are discussing the details of a pending drug transaction. The drug type, quantity and price are all unspecified, however, given the context of the

text message, I believe that PERRY informs the unidentified party that he (PERRY) will purchase any available amount of the drugs.

     44.    In addition, investigators identified a telephone text message occurring on November 16, 2017, sent from an unidentified person (hereinafter "UP 3957") at telephone number 203-650-8931, to Salvatore PERRY at the Target Telephone. The text message is as follows: "I have the rest of the scratch, u want to get rid of 20 to 25 more?"  Based upon my training and experience and upon my knowledge of this investigation, I believe that in the above referenced telephone text message Salvatore PERRY and UP 3957 are discussing the details of a pending drug transaction. The drug type and price are unspecified, however, given the context of the text message, I believe that the unidentified person informs PERRY that they have monies available to pay PERRY ("I have the rest of the scratch") to purchase twenty to twenty five additional units of an unspecified drug from PERRY ("u want to get rid of 20 to 25 more?").

     45.    Similarly, investigators identified a telephone text message occurring on November 17, 2017, sent from an unidentified person (hereinafter "UP 1196") at telephone number 203-892-1196, to Salvatore PERRY at the Target Telephone. The text message is as follows: ""Can u grab me on of them blues before we go been of clinic for 2 days bones and knewws r killin me".  Based upon my training and experience and upon my knowledge of this investigation, I believe that in the above referenced telephone text message Salvatore PERRY and UP 1196 are discussing the details of a pending drug transaction.  Given the context of the text message, I believe that the unidentified person asks PERRY for a single 30 milligram oxycodone pill ("on[e] of them blues").

     46.    In addition, investigators identified a telephone text message occurring on November 18, 2017, sent from an unidentified person (hereinafter "UP 8931") at telephone number 203-650-

8931, to Salvatore PERRY at the Target Telephone. The text message is as follows: "I'm ready to square up". Based upon my training and experience and upon my knowledge of this investigation, I believe that in the above referenced telephone text message Salvatore PERRY and UP 8931 are discussing the details of a pending drug transaction. The text message is absent a type and quantity of drug, however, given the context, I believe that the unidentified person is informing PERRY that they are prepared to provide (or receive) monies owed to (or from) PERRY.

47.     Given my training and experience, I know that distributors of illegal drugs use cellular telephone to further their drug distribution activities. These communications often involve the use of traditional telephone calls and text messaging. With respect to this investigation, I believe that the text message communications were completed in furtherance of the target telephone's drug distribution activities. Given my training and experience, and knowledge of this investigation, I believe that PERRY continues to use the target telephone to communicate via traditional telephone calls and text messages in furtherance of his drug distribution activities.

## BACKGROUND TO STORED COMMUNICATIONS

48.     In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and un-retrieved voicemail, text, and multimedia messages for Verizon Wireless subscribers may be located on the computers of Verizon Wireless. Further, I am aware that computers located at Verizon Wireless contain information and other stored electronic communications belonging to unrelated third parties.

49.     Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or

wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging" or "wireless messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Verizon Wireless for short periods incident to and following their transmission. In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

50.     Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

51.     Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

52.     Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or

18

device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

53.     Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

54.     In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records

of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

55.     I anticipate executing the search warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the requestes warrant to require Verizon Wireless to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

56.     I submit that this affidavit supports probable cause for a search warrant directed at Verizon Wireless for telephone text messages and other content associated with the Target Telephone, which items are described in Attachment A and which constitute evidence, fruits, and instrumentalities of criminal activity and, more specifically, violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Possession with Intent to Distribute and Distribution of Oxycodone), and 21 U.S.C. § 846 (Conspiracy to Distribute Oxycodone).

57.     Based upon the ongoing nature of this investigation and in order the protect the identity and well-being of the CS who is still actively cooperating with law enforcement, I respectfully request that this affidavit and the requested search warrant be maintained under seal until July 31, 2018, which may be extended by the Court upon written application by the United States.

Dana R. Mofenson
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me this 8th day of June, 2018.

/s/ Sarah A. L. Merriam, USMJ

Honorable Sarah A.L. Merriam
United States Magistrate Judge

**ATTACHMENT A**
**(Property to Be Searched)**

This warrant applies to information associated with the account for telephone number (203) 231-0439, which is stored at premises owned, maintained, controlled, or operated by Verizon Wireless, wireless provider headquartered at Basking Ridge, New Jersey.

**ATTACHMENT B**
**(Items to be Seized from Verizon Wireless)**

I.      **Information to be disclosed by Verizon Wireless**

To the extent that information described in Attachment A is within the possession, custody, or control of Verizon Wireless, including any messages, records, files, logs, or information that have been deleted but are still available to Verizon Wireless or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Verizon Wireless is required to disclose the following information to the government for each account or identifier listed in Attachment A:

1.   All voice mail, text, and multimedia messages stored and presently contained in, or on behalf of the account or identifier;

2.   All existing printouts from original storage of all of the text messages described above;

3.   All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used from March 10, 2018 through and including April 30, 2018 only;

4.   All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the messages;

23

5.     All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names, addresses, shipping addresses, date account was opened, length of service, types of service utilized, ESN or other unique identifier for the wireless device associated with the account, Social Security Number, date of birth, telephone numbers, and other identifiers a associated with the account;

6.     Detailed billing records, showing all billable calls including outgoing digits, from March 10, 2018 through and including April 30, 2018;

7.     All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number), from March 10, 2018 though and including April 30, 2018.

## II.   Information to be seized by the government

All information described above in Section I that that constitute fruits, evidence, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Possession with Intent to Distribute and Distribution of Oxycodone), and 21 U.S.C. § 846 (Conspiracy to Distribute Oxycodone), from March 10, 2018 through and including April 30, 2018, including the following:

1.     The illegal procurement, possession, or distribution of controlled substances, including but not limited to oxycodone;

2.     Records relating to who created, used, or communicated with the account or identified, including records about their identities and whereabouts.